# American Steel Foundries, Appellant, v. The Railroad Supply Company, Appellee.

## Gen. No. 28,986.

1. LIMITATIONS OF ACTIONS—*entry of credit as payment tolling statute.* In an action on an account for a balance admittedly unpaid to which defendant pleaded the statute of limitations where it appeared that defendant was a jobber in railroad supplies and plaintiff a manufacturer of such supplies; that the regular course of dealing between the parties was for defendant to send its orders to the plaintiff and for plaintiff to ship the supplies directly to the customer, sending the bill and collecting the same and crediting defendant's account with the profit due it on the transaction; that on July 6, 1909, plaintiff wrote an acknowledgment of an order sent by defendant stating that it would invoice the material direct to the customer "crediting you with the difference between" the sale price and plaintiff's price; that when the entire transaction was completed by payment by the customer a credit for the profit due defendant was entered, on October 20, 1909, on the account of defendant and a credit memorandum sent to it to enable it to make proper entries on its books, such credit being the last entry on the account kept by plaintiff and being received by defendant and entered on its books, the statute of limitations was tolled as of the latter date, not of July 6 when the receipt of the order was acknowledged.

2. LIMITATIONS OF ACTIONS—*entry of credit on defendant's books as evidence of credit tolling statute.* In an action on an account where plaintiff's books show as the last entry a credit dated October 20, 1909, for defendant's profit on a shipment by plaintiff to a customer in accordance with their regular practice, a belated entry of such item in April, 1914, in defendant's books, while perhaps insufficient as an acknowledgment of the debt on the latter date under the statute of limitations, is an evidentiary and corroborative circumstance relating back to October 20, 1909, and tending to show that defendant received and recognized the credit memorandum sent to it by plaintiff and made its final entry from that source, acknowledging that the transaction involved was not completed until that date.

Appeal by plaintiff from the Superior Court of Cook county; the Hon. JOSEPH H. FITCH, Judge, presiding. Heard in the third division of this court for the first district at the October term, 1923. Reversed and judgment here. Opinion filed December 24, 1924.

PAM & HURD, for appellant.

MONTGOMERY, HART & SMITH, for appellee; LOUIS
E. HART and IRVING HERRIOTT, of counsel.

MR. JUSTICE TAYLOR delivered the opinion of the
court.

On August 21, 1914, the plaintiff, American Steel
Foundries, brought suit in assumpsit in the superior
court against the defendant, The Railroad Supply
Company. The affidavit of claim recited the amount
due to be $20,184.65. The defendant filed a plea of the
general issue, and of the five-year-statute of limita-
tions, and also a plea of set-off. A demurrer was filed
to the plea of set-off, and was sustained. The de-
fendant filed an affidavit of merits to the whole of
the plaintiff's demand. The plaintiff filed a similiter
to the defendant's plea of the general issue, and a
replication to the plea of the statute of limitations.
That replication recited that from September 5, 1901
to October 20, 1909, the defendant paid on the sev-
eral causes of action the sum of $16,522.61, the last
payment being on October 20, 1909, and, on the vari-
ous dates of payments made, acknowledged the causes
of action set up; that the date of the last acknowl-
edgment was October 20, 1909; and that the plaintiff
commenced its action within five years next after the
defendant's acknowledgment of said several causes of
action. The cause was tried without a jury, and a
judgment entered in favor of the defendant. From
that judgment this appeal was taken.

The chief question involved is whether a certain
debt of $20,184.65 from the defendant to the plaintiff,
which admittedly has not been paid, was outlawed at
the time this suit was begun. This suit having been
begun on August 21, 1914, it became necessary, in
view of the plea of the defendant of the statute of
limitations, for the plaintiff to prove that sometime

within the preceding five years, that is, since August 21, 1909, the defendant had done such things that, legally considered, the running of the five-year-statute of limitations had been tolled.

The last transaction which occurred between the parties, and which constitutes the chief matter of fact to be considered, stated generally is as follows:

On June 4, 1909, the defendant entered into a contract with the Seattle Railway Company, whereby the defendant was to sell and deliver to the Seattle Railway Company 24 knuckles, weighing 1,228 pounds, and for which the Seattle Railway Company was to pay the defendant four cents a pound. Subsequently, on July 3, 1909, the defendant requested the plaintiff to manufacture and ship the 24 knuckles to the Seattle Railway Company. In making that request it was understood both by the plaintiff and the defendant— that understanding being implied from their former practice and from letters that passed between them— that the plaintiff should invoice the merchandise when manufactured and sent, so that the price fixed in the contract between the defendant and the Seattle Railway Company of four cents a pound would be paid by the Seattle Railway Company directly to the plaintiff, and that when (according to the claim of the plaintiff) the plaintiff was paid it would take for itself three cents a pound, or $36.84, being its total charge for manufacturing the merchandise, and then credit the defendant's account with one cent a pound, or $12.28, thereby reducing the defendant's debt to the plaintiff to that extent.

The theory of the plaintiff is: (1) that it was the agent of the defendant for certain purposes, including the collection and application of certain moneys on the indebtedness owed by the defendant to the plaintiff; that a collection was made and the proceeds applied strictly in conformity with the authority thus conferred; and that that payment had the same legal

effect with respect to the statute of limitations as if made by any other agent of the defendant duly authorized to make such a payment; (2) that a payment was actually made upon the account within the statutory period; that the defendant was advised of the payment and adopted it as a credit received during the statutory period to which the defendant was entitled; and that whether there had been any pre-existing agency or not, the adoption and acceptance of the credit by the defendant had the same legal effect as if the payment had been made directly by the defendant.

The theory of the defendant is, that the last act of the defendant, which may be relied upon by the plaintiff as a partial payment, "was the turning over by the defendant to the plaintiff the order for 24 Hein Knuckles, which occurred on or about July 3, 1909."

In view of the contentions made, and in order to understand fully what was done by each of the parties to the transaction in question, it becomes necessary to recite somewhat in detail the history of the relations of the plaintiff—and its predecessor, the American Steel Castings Company—with the defendant; and that involves a series of letters that passed between them; entries in the books of the plaintiff and of those of the defendant; their methods of bookkeeping; the issuance of credit memoranda by the plaintiff to the defendant and the action of the defendant concerning them, and the testimony of certain witnesses.

The plaintiff, American Steel Foundries (and its predecessor, American Steel Castings Company), manufactured and dealt in steel castings. The defendant dealt in couplers and railway supplies prior to 1902, and had become greatly indebted to the American Steel Castings Company. Subsequently, some time prior to February, 1903, the plaintiff took the place of and became the assignee of the indebtedness due to the American Steel Castings Company, so that

the suit here is in the name of the American Steel Foundries Company. After the assignment, the defendant dealt with the plaintiff and from time to time acknowledged the latter as its creditor.

The evidence shows that as early as June, 1902, the American Steel Castings Company, as a manufacturer, filled orders or contracts that were obtained by the defendant, and collected the proceeds of those orders, or contracts, from the purchasers, who were the defendant's customers, and with the sanction and authority of the defendant applied parts of the amounts collected in reduction of the general indebtedness of the defendant to the plaintiff.

The following extracts from eighteen letters that were put in evidence show the way in which they dealt with each other, and, inferentially, their understanding as to their mutual conduct.

On June 3, 1902, the defendant wrote to the American Steel Castings Company as follows:

"We wired you today to 'Invoice couplers direct to St. Paul Road. Full instructions by mail tonight,' and now beg to confirm same. We also enclose you authority from the railroad company to bill direct to them.

"Our contract with the Chicago, Milwaukee & St. Paul on these couplers is $18 per pair, f. o. b. Milwaukee. All other conditions regarding couplers are stated on the orders, except that the St. Paul Road has always discounted their bills at the rate of 2% for cash in 10 days, and on all existing orders will undoubtedly insist upon this condition.

"Will you please keep us thoroughly posted regarding the shipments so that we can be in touch with the St. Paul Road and keep them advised as to dates of inspection? Of course, in carrying out this arrangement it will not be necessary for us to keep an Inspector at your plant, but we take it for granted that you will keep us posted as to the tests which the couplers show and that the matter of testing will go on in the future as it has in the past."

On June 3, 1902, the defendant wrote to the St. Paul road that, in order to save double accounting which had theretofore taken place between the manufacturers in the steel casting business and it, the defendant, it had "closed an arrangement with the American Steel Castings Company under which that company will hereafter invoice direct for all couplers manufactured by them for our account"; and that all bills relating thereto should thereafter be paid to the American Steel Castings Company.

On the same date, the St. Paul road wrote to the defendant announcing that the method of invoicing couplers as outlined would be satisfactory.

On June 9, 1902, the defendant wrote to the American Steel Castings Company,

"You are hereby authorized to bill against the Anglo-American Refrigerator Car Co. for 100 couplers on our order #17047 at $18.80, accounting to us for the difference between this and $13.75."

On June 17, 1902, the American Steel Castings Company wrote to the defendant that it was in receipt of certain orders which were addressed to the defendant, but that it would be necessary for it, the American Steel Castings Company, "before shipping these couplers to have authority from the Penn. Railroad Co. to invoice them direct, which you will note you have failed to furnish us. This authority is necessary in every instance when you send us orders of this kind and should be furnished in addition to your authority for so billing them."

On the same date, the American Steel Castings Company wrote another letter to the defendant concerning another order, as follows:

"You understand that it will be necessary for us to have authority from Lexington & Eastern Co. to invoice the castings directed to them, and on any orders that you send us, you will kindly arrange that this authority is furnished.

"While you send us the Lexington & Eastern order,

234    APPELLATE COURTS OF ILLINOIS.

Amer. Steel Foundries v. The Railroad Supply Co., 235 Ill. App. 228.

you will note that it is addressed to you, and really does not affect our position in any degree. We will, therefore, hold the matter in abeyance until we receive further advices, instructing us to invoice the castings direct to your customer.

"We will, of course, use your price in issuing these invoices."

On January 15, 1903, the defendant wrote the plaintiff, suggesting that some plan might be devised whereby orders for parts of couplers "could be put up to your company direct, you billing and collecting for same as you do the couplers, crediting the account with the difference between the cost and selling price. * * * The only way we can fill the orders, as we have been doing is to have the knuckles from you shipped to Chicago and re-shipped from here."

That letter contains the following:

"Under the contract Hein has with the Railroad Supply Co., regarding his patent, I presume if we should discontinue the selling of the malleable coupler he could insist upon the surrender of his patent, and cancel his contract with the company. I do not understand you have a malleable plant in your association to whom this business could be transferred. If you had, I should certainly recommend and advise you to arrange to make the malleable coupler at this plant letting us put the orders to you, and crediting us with the difference between the cost and selling price."

On February 10, 1903, the defendant wrote the American Steel Foundries as follows:

"I find on my return to the city your letter of the 28th ult. enclosing a voucher covering unpaid bills due us from the Sargent Co. amounting to $262.03, with request that we receipt this voucher, return same to you, and you would place same to our credit on the books of the American Steel Castings Co.

"Under an agreement made by the American Steel Castings Co., the Illinois Steel Co. and the Pennsylvania Steel Co. these companies were to retain certain profits on goods manufactured by them which

were to be billed and collected by these companies for our account, crediting to our account the difference between the purchase price and the amount for which the goods were sold. In other words, you were to retain the gross profits, applying same to liquidation of the account. Under the arrangements under which the Illinois Steel, Pennsylvania Steel and your company are working, this bill should be paid by your company to us in cash. Mr. Daniel Eagan is thoroughly familiar with the arrangement under which we are working, and I think by referring the matter to him he will inform you that the account rendered against the Sargent Co. should be paid in cash to this company.

"I return herewith voucher with request that you send us remittance to cover same."

On August 4, 1903, the defendant wrote the plaintiff that a certain statement of account which the plaintiff had sent to the defendant was correct, save that a certain credit for shipments made in April, May and June had not been given the defendant. That letter contains the following:

"As you sent us a credit memorandum dated July 10th, for $283.01, this difference was undoubtedly taken into your July account. Balance shown on our books due you on June 30th is $31,723.40. The credit memorandum referred to shows the difference between the two statements."

On February 29, 1904, the defendant wrote the plaintiff that it expected materially to reduce its indebtedness to the plaintiff out of the profits made that year.

On May 10, 1906, the defendant wrote the plaintiff as follows:

"Replying to your letter of the 3d inst. and referring to your statement dated February 28, 1906, which you claim shows a balance of $20,843.87, beg to state our records show we have received invoices and statements from your company practically for the same amount."

The next letter from the defendant to the American Steel Foundries Company is dated June 12, 1906, and is as follows:

"Below please find list of orders on which we have not received notice of shipment. The orders have, however, undoubtedly been filled, and in order to enable us to close our records would ask that you furnish copy of invoice covering each order, together with credit memorandum for our proportion."

On December 31, 1907, the defendant wrote to the plaintiff, calling its attention to three different orders on which it stated it had not received credit memoranda covering its proportion, and requesting plaintiff to send credit memoranda at an early date to enable the defendant to close its records. Concerning the same matters, the defendant wrote again, January 16, 1908, stating that it had "not yet received credit memorandum" on account of those orders, and closed with the words, "Please favor us with credits covering these orders."

On May 1, 1908, the plaintiff wrote to the defendant, acknowledging the receipt of an order for 40 Hein Knuckles to be shipped to the Reid Newfoundland Company. That letter recites: "We will charge the Reid Newfoundland Co. 4¢ per lb. F. O. B. our works, for this material and will credit your company with difference between this price and our price to you, viz: 3.30¢ per lb. F. O. B. our works."

On September 16, 1908, the plaintiff wrote to the defendant concerning another order, stating therein that it would invoice that particular merchandise at four cents per pound, "crediting you with the difference between this price and our price to you at 3¢ per lb. F. O. B. our works, Indiana Harbor, Ind."

On December 29, 1908, the plaintiff wrote the defendant, acknowledging receipt of another order, and stating the terms on which it would invoice the material to the purchaser, and that it would credit the account of the defendant with the difference in price.

On May 12, 1909, the plaintiff wrote the defendant, acknowledging the receipt of another order and stating that it was entering for prompt shipment, and "will bill material direct to your customer at a price of 4¢ per lb. f. o. b. our works, Indiana Harbor, Ind., crediting your account with the difference between this price and our price to you at 3¢ per pound, f. o. b. Indiana Harbor, Ind."

On July 6, 1909, the plaintiff wrote to the defendant as follows:

"We beg to acknowledge receipt of your valued order of July 3, No. 22599, calling for 24 Hein Knuckles to be shipped to the Spokane, Portland & Seattle Ry. Co., their Order No. P—3180.

"We will invoice this material direct to your customer at a price of 4¢ per pound, f. o. b. our Works, crediting you with the difference between this price and our price to you of 3¢ per pound, f. o. b. Indiana Harbor, Ind.

"Thanking you for the order, we are,"

As to the books of account: the first entry made by the plaintiff in its books in regard to the transaction in question was dated July 10, 1909, which shows that a shipment was made by the plaintiff on that date to the Seattle Railway Company from the Indiana Harbor Works of the plaintiff; that the weight of the shipment was 1,228 pounds, and that the value of that shipment was $49.12, and that it was sent f. o. b. the Indiana Harbor Works.

The second entry in the books of the plaintiff was under date of September 7, 1909, and shows that a remittance was received from the Seattle Railway Company of $49.12, and was in payment of the shipment of July 10, 1909. Another entry was introduced in evidence on behalf of the plaintiff, which was made in the general ledger journal. That entry was made on October 20, 1909, and shows that the account, "Reserved for Disbursement and Royalties," is charged with $12.28, and the general ledger account, called sus-

pense ledger, is credited with $12.28. When the witness Epple, who had been secretary and treasurer of the plaintiff for 20 years, was asked what that entry showed, he answered: "That entry shows that the Railroad Supply Co. was credited with $12.28 on October 20, 1909, for commission on Spokane, Portland & Seattle Railway Order No. P-3180, on June 4, 1909, for 24 Hein Knuckles on the basis of 1228 pounds, at 1 cent per pound." In explaining the entry on the suspense ledger, the witness testified that it meant that the journal entry had been posted, "this account to the credit of the Railroad Supply Company, bearing date October 20, 1909." The witness further testified that he was unable to find any other book containing entries relating to the order in question, and that the entries referred to would normally complete the transaction on the books of the plaintiff.

As to credit memoranda: The evidence shows that it was the practice of the plaintiff to send to the defendant, from time to time, in the regular course of business, certain documents, each of which was entitled "Credit Memorandum." Eleven such documents were put in evidence covering eleven transactions, including the one here in question. Those transactions all took place between the plaintiff and the defendant between March 28, 1907, and October 20, 1909, the date of the last, which is the one here in question. It was stipulated that the credit memoranda were received by the defendant at about the dates they bear. Counsel for the defendant stated in answer to a question asked by the court: "They were sent out in the regular course of business, that is, I mean whether they were sent out as they should be, but they were made up and mailed to us, and received by us, and after that there was no question." It was further admitted that the credit memoranda themselves that were introduced in evidence came from the possession of the defendant. The credit

memorandum itself was a printed blank partly filled in with typewriting and script.

The following is the substance of the credit memorandum received by the defendant from the plaintiff on or about October 20, 1909:

"Credit Memorandum
American Steel Foundries
                 Entered
             Chicago, October 20/09
"To Railroad Supply Co. Oct. 21-9:09 A. M. 1909
        Order 22599, 7/3/09
        For Commission on 24 Hein Knuckles, covered by Spokane, Portland & Seattle Ry.
        Order P 3180 of 6/4/09.
        1228 lbs. at 1¢ per lb.                          12.28
Approved A. Bentley, American Steel Foundries
        Comptroller L. T. A.

                                    Manager Claim Dept."

The evidence of Crilly is to the effect that while he was employed by the plaintiff, credit memoranda were issued by the clerk having charge of that detail and then approved by the assistant to the comptroller before they went out; that they were not necessarily issued on the date of the transactions which they purported to cover; that they could not say on what dates the transactions covered by the credit memoranda 3 to 13 actually occurred; that there was a credit memorandum of October 20, 1909, of $12.28 which shows when the credit accrued to the defendant; that the purpose of sending a credit memorandum was to get into "the books of the other company to whom the credit memorandum was sent a credit which has accrued"; that the credit may be entered upon the books of the one sending the credit memorandum at the time it was sent, or previous thereto; that "the credit memorandum of a properly run organization is issued and forwarded within a very reasonable time after credit accrues"; that the credit memoranda 3 to 13 might have represented transactions that oc-

240 APPELLATE COURTS OF ILLINOIS.

Amer. Steel Foundries v. The Railroad Supply Co., 235 Ill. App. 228.

curred on the dates they bear, or at some previous time; that the words, "We have this day credited your account as follows," appearing in the credit memoranda 3 to 13, are in printed red type on a printed form; that the bookkeeper made the original entry of credit on his books from the credit memoranda.

The evidence, therefore, may be said to show substantially the following:

(1) That the defendant was a jobber, and made contracts with its customers to sell to them certain railway supplies at a fixed price, and made from those contracts a certain profit.

(2) That for many years it had been greatly indebted to the American Steel Castings Company, and its successor, the plaintiff.

(3) That the defendant dealt in patented couplers made under a contract it had with one Hein, the patentee, and its contractual relations with Hein were such that if it, the defendant, discontinued selling the patented couplers, there was danger that Hein "could insist upon the surrender of his patent, and cancel his contract" with the defendant.

(4) That as far back as June 3, 1902, the defendant ordered couplers (see the two letters of June 3, 1902) from the American Steel Castings Company, and, in doing so, directed that company to bill them direct to the defendant's customer, and requested the plaintiff to keep the defendant posted as to the shipments and dates of inspection, etc.

(5) That in 1902, the American Steel Castings Company suggested to the defendant that, in every case before making shipments, it would be necessary for it, the American Steel Castings Company "to have the authority of the railroad companies to whom the castings are to be shipped," but the defendant (see letters January 15 and February 10, 1903) refused to accede to the suggestion, referred to the Hein contracts regarding his patent, and stated that the agree-

ment was that the plaintiff, as well as the Illinois Steel Company and the Pennsylvania Steel Company "were to retain certain profits on goods manufactured by them, which were to be billed and collected by these companies for our account, crediting to our account the difference between the purchase price and the amount for which the goods were sold. In other words, you were to retain the gross profits, applying same to liquidation of the account."

(6) That it was the practice, from an early date in their relationship, for the plaintiff to send the defendant credit memoranda covering the defendant's proportion of the receipts, and showing its application to the defendant's general indebtedness; that the credit memoranda constituted a part of their mutual method of doing business, and were solicited, received and sanctioned by the defendant, and used by it to keep and "close its records."

(7) That on June 4, 1909, the defendant entered into a contract with the Seattle Railway Company to sell and deliver to it 24 knuckles, weighing 1,228 pounds, for which the Seattle Railway Company was to pay the defendant four cents a pound; that subsequently, on July 3, 1909, the defendant requested the plaintiff to send 24 knuckles to the Seattle Railway Company; that in making that request it was understood both by the plaintiff and the defendant that the plaintiff should invoice the merchandise when manufactured and sent, so that the price fixed in the contract between the defendant and the Seattle Railway Company of four cents a pound would be paid, for convenience of both the plaintiff and the defendant, by the Seattle Railway Company, directly to the plaintiff, and when the plaintiff was paid, it would take for itself three cents a pound, or $36.84, being its total charge for manufacturing and shipping the merchandise, and then credit the defendant's general indebtedness with one cent a pound, or $12.28, thereby reducing the defendant's debt to the plaintiff to that

extent; that on July 6, 1909, the plaintiff wrote the defendant acknowledging the receipt of its request, or order, reciting, as it did in similar preceding acknowledgments, "We will invoice this material direct to your customer at the price of 4¢ per pound, f. o. b. our Works, crediting you with the difference between this price and our price to you of 3¢ per pound, f. o. b. Indiana Harbor, Ind."; that on July 10, 1909, the merchandise was shipped by the plaintiff to Seattle Railway Company, and on September 7, 1909, the plaintiff received a remittance therefor; that on October 20, 1909, the plaintiff entered a credit on its books on defendant's general indebtedness in the sum of $12.28, and sent the defendant a credit memorandum stating that it had credited the defendant's account with $12.28; that that credit memorandum was received in due course by the defendant and used by it in making its record of that transaction.

(8)   That the entries in the books of account of the plaintiff and the defendant show that no credit was given on July 3, 1909, immediately after the plaintiff had received a request from the defendant to ship the 24 Hein knuckles to the Seattle Railway Company; that the first entry in the books of account of the plaintiff which may, in any event, be said to show that the defendant was entitled to credit in the transaction in question was made on September 7, 1909, which showed a remittance of $49.12 was received from the Seattle Railway Company on that date; that the first entry in the books of account of the plaintiff that shows an actual reduction of the general indebtedness of the defendant, arising from the transaction in question, was made on October 20, 1909, when there was entered a credit to the defendant in the sum of $12.28, being the amount of the defendant's gross profit on its sale of the 24 knuckles to the Seattle Railroad Company; that, in corroboration of the plaintiff's entry of the credit as properly of October 20, 1909, an

entry was made on April 8, 1914, by the defendant in its journal, as follows, "Oct. 20, 1909, Cr. Memo. $12.28"; that these entries tend to show that the defendant considered the credit of $12.28 was available only after the transaction had been entirely closed, and not when the request or order of July 3, 1909, was sent.

From the foregoing and considering all the evidence in the case and the law applicable thereto, in our judgment, when the plaintiff, pursuant to authority which the defendant had expressly given it, and in accord with the practice running over some years, on October 20, 1909, entered in its books of account a credit on the defendant's debt in the sum of $12.28, and then sent by mail a credit memorandum to the defendant showing what had been done, which credit memorandum was received by the defendant at or about that time and received by it in accordance with the understanding which had been established between them, and sanctioned, by their mutual practice, and was in reality approved and used as the basis of entries on its own books, there was such an acknowledgment of the debt by the defendant that the running of the statute was then tolled.

It is urged for the defendant that no acknowledgment of the debt of the defendant to the plaintiff, partial payment thereof, or implied promise on the part of the defendant to the plaintiff to pay the account of the plaintiff, appears in any transaction which occurred after July 3, 1909. That, however, seems to ignore what the evidence shows in regard to their understanding as to their business relations and the effect of their mutual conduct and their established course of dealing. The evidence of their practice and the course of business as they pursued it demonstrates that it was not the intention of either that the defendant should receive a credit at the particular time the order of July 3, 1909, was sent by the defendant

to the plaintiff. On the other hand, all the pertinent evidence, the letters and discussion therein of their relations and practice as to credit memoranda, the entries in the plaintiff's and the defendant's books, and the common sense of the situation, conspire to demonstrate that credit was to be given, as authorized by the defendant, not earlier than the time when the defendant's customer paid for the merchandise; or when credit had been duly entered by the plaintiff and notice thereof given by it to the defendant by an appropriate credit memorandum. Of course, the defendant was at liberty, notwithstanding their understanding, to challenge or repudiate any credit memorandum which it received. Nothing of that kind was done, however, but, on the contrary, the very credit memorandum sent by the plaintiff, covering the item in question, was, in reality, according to the books of the defendant, sanctioned and approved.

The fact that the plaintiff on July 6, 1909, wrote an acknowledgment of the receipt of the request or order of the defendant and in that letter of acknowledgment used the words, "We will invoice this material direct to your customer at a price of 4¢ per pound, f. o. b. our Works, crediting you with the difference between this price and our price to you of 3¢ per pound, f. o. b. Indiana Harbor, Ind." does not, having in mind their method of doing business with each other as shown by the evidence, suggest in any way that the plaintiff on July 6, 1909, before the merchandise was manufactured, shipped or paid for, actually gave the defendant credit on its account for the amount of profit there might be in that order if carried out and paid for. It is true, also, that the first entry made on the books of the plaintiff was in its "Customers' Sales Ledger," and was made on July 10, 1909, but that entry was properly made, the intention being to preserve a record of all that might transpire in the course of that transaction from the

beginning and until finally executed by receipt and disbursement of the proceeds. The use of the word "crediting" in the letter of acknowledgment of July 6, 1909, by the plaintiff, obviously means that the plaintiff would credit the difference on the defendant's account at the close of the transaction. That letter, at most, merely informed the defendant that its request for the shipment of 24 Hein knuckles had been received and that the plaintiff would send them direct to the defendant's customer, at a certain price, and, when the merchandise was paid for, would give the defendant credit at the rate of one cent per pound. There is no evidence whatever tending to show that the defendant was entitled to credit on that order until the merchandise was paid for.

All that the plaintiff gave the defendant on July 3, 1909, was a request; and that did not represent anything, bearing in mind their way of doing business, and their mutual understanding, from which a credit *in praesenti* could be deduced. The plaintiff might or might not comply with that request, according as it saw fit. At that time all was *in fieri*.

Counsel for the defendant have cited a series of English cases, *Marrico v. Richardson,* L. J. R. (N. S.) 859; *Gowan v. Forster,* 3 B. & Ad. 507; *Turney v. Dodwell,* 3 El. & Bl. 136; and *Hadley v. Hadley,* 67 L. H. ch. 694, all of which may be said to support the principle, which was stated by Lord Campbell, Chief Justice, in the *Turney* case, that where a bill of exchange has once been so delivered in payment on account of the debt as to raise an implication of a promise to pay the balance, the statute of limitations is restored as from the time of such delivery, whatever afterwards takes place as to the bill.

Counsel have, also, cited, in support of the same principle, the following decisions of our own courts: *Root v. Bradley,* 1 Kan. 437; *Lyon v. State Bank,* 12 Ala. 508; *Pracht v. McNee,* 40 Kan. 1, 18 Pac. 925;

*Wolford v. Cook,* 71 Minn. 77, 73 N. W. 706; *Smith v. Ryan,* 66 N. Y. 352; *Harper v. Fairley,* 53 N. Y. 442; *Atwood v. Lammers,* 97 Minn. 214, 106 N. W. 310.

In those cases, speaking generally, the creditor was given a bill of exchange, or a promissory note, which was in and of itself an evidence of a property right, of someone's obligation, but here, to reiterate, when the defendant sent its request on July 3, 1909, all the plaintiff got was an opportunity, if it desired to take advantage of it, to bring into being, by reason of that request and of the defendant's contract with the Seattle Railway Company, a debt some time in the future on the part of the Seattle Railway Company to the defendant, which debt, however, when it came into being was to be paid, for the convenience and by the agreement of the parties, to the plaintiff, and 75 per cent of it kept by the plaintiff for its material and services, and 25 per cent of it applied by it— thus acting for the defendant pursuant to their mutual understanding and agreement—to lessen the then existing general debt of the defendant. The principle of those cases, therefore, the facts here being so different, does not apply.

For the defendant, considerable emphasis is placed upon the case of *Butts v. Perkins,* 41 Barb. (N. Y.) 509. The facts in that case are as follows: In the month of April, 1855, one Harrington made an agreement with Perkins, the defendant, that the latter should manufacture a set of tombstones, for which Harrington, when the stones were taken away from the defendant's shop, would pay the sum of $26.50. The defendant manufactured the stones and had them ready for delivery and at his shop in October, 1855. Prior to that date, Harrington had sold some cattle to one Straight and they agreed between themselves that Straight was to pay the defendant, Perkins, the price of the tombstones for Harrington, and Harrington would credit Straight with that amount on his de-

mand against Straight for the cattle.    In October,
1855, Straight told the plaintiff, who was about to go
to the town where defendant had his place of business,
that there was a set of tombstones at defendant's
place, and that he, Straight, had agreed with Harring-
ton to pay for them, and requested the plaintiff to
call at defendant's shop and bring them in.    An
agreement was then made between the plaintiff and
Straight by which, if the plaintiff would consent, the
price of the stones was to be applied on a promissory
note which the plaintiff then held and which was
signed by the defendant Perkins, and that Straight
should pay the price of the stones to the plaintiff in-
stead of paying it to the defendant.    In October, 1855,
the plaintiff called at the defendant's shop, got the
stones and took them to Straight.    At the time the
plaintiff got them it was agreed between the plaintiff
and defendant that the price, $26.50, should be ap-
plied on defendant's note, and that Straight might
pay said price to the plaintiff instead of paying it to
the defendant; that when Straight paid it, the defend-
ant was to indorse it on the note, and the plaintiff,
also, was to notify Straight that he was to pay the
said price to him, the plaintiff.    When the plaintiff
took the stones to Straight, he notified him of the
agreement between the plaintiff and the defendant.
The plaintiff made no request for payment upon
Straight.    On April 1, 1856, Straight paid the $26.50
to the plaintiff.    The latter then indorsed the payment
on the note.    Defendant was not present when the
indorsement was made, and knew nothing of it.    The
price of the stones was due in October, 1855, when
they were taken from the defendant's shop by the
plaintiff.    The court there said: ''The effect of the
transaction was to substitute Straight in place of the
defendant, as debtor to the plaintiff, for the price of
the stones, and it operated *in praesenti* as a payment
of such price upon the note.    *    *    *    The plaintiff

could have maintained an action against Straight for the price of the stones. He could not have avoided applying such price upon the note, even if he had failed to collect it of Straight. It was immaterial to defendant whether the plaintiff could or should collect the price of the stones of Straight. He parted with the possession of the stones in part payment of his note, and as he delivered them to the plaintiff on a new agreement with him, he parted with all right of action therefor against Straight or Harrington." The court, therefore, held that the agreement canceled $26.50 of the defendant's indebtedness on the note as of the date of the delivery of the stones, and that the tolling of the statute began at that time.

It will be seen that the facts are very different in the *Butts* case from those in the instant case. In that case there was a binding agreement that a certain specific existing account should be assigned to the creditor. It was a definite chose in action which was transferred to the creditor; whereas, in the instant case, there was no assignment of any kind of an existing account, the fact being that, as we have already said, by the order of July 3, 1909, plaintiff merely got an opportunity to do some work and furnish certain materials, and thereby ultimately to make some business profit. Further, the *Butts* case was one of complete novation. Here there was no such occurrence; in fact, the defendant notified the plaintiff as far back as January 15, 1903, that in their dealings the defendant must remain the seller, otherwise it might endanger its contract rights under the Hein patent; and, further, even though the full price charged by the defendant was to be sent directly to the plaintiff, still 25 per cent of the price belonged all the time to the defendant. The fact that the defendant had expressly contracted with the plaintiff that the latter should credit the former with 25 per cent of the amount paid, is certainly no evidence that the defendant had given

up all interest in its contract with the Seattle Railway Company; rather, it is the contrary.

It is contended for the defendant that: "The weight of authority is to the effect that neither the plaintiff nor the Spokane, Portland & Seattle Railway Company had any authority to bind the defendant in this case by a new promise to pay the balance of the debt due from the defendant to the plaintiff"; seeming to intimate that such authority could not be created. With that we are not able to agree. In our judgment, the defendant was entitled, under the law, if it saw fit, to make such a contract, and, further, as a matter of fact, did so. In Mechem on Agency, vol. 1, sec. 9, that author says: "It is sometimes said that there is no distinct law of agency at all,—that is, there is no body of rules peculiar to it, but that it is simply a case in which we apply the familiar rules of contract, tort, etc., to a new set of facts." Here, the plaintiff undertook on October 20, 1909, to do something for the defendant as the result of their mutual agreement, that is, to give it credit on its debt, without the intervention of a third person, and, although that mutual agreement may suggest an agency, it is, as a matter of law, a contractual relationship, and to be considered, according to law, a contract, and binding as such. It may be an unusual situation of fact, but there is nothing anomalous about it as a matter of law.

In the case of *Wanamaker & Brown v. Plank,* 117 Ill. App. 327, where collateral security was deposited with a third person to secure a part of the note sued upon, the court said: "We are aware of no principle of law which makes the holder of collateral security placed in his hands coincident with the making of a note thereby secured, an agent of the debtor with authority to bind him by a new promise to be implied from a payment of which the actual debtor is ignorant, having no knowledge as to when it is made or in

250     APPELLATE COURTS OF ILLINOIS.

Amer. Steel Foundries v. The Railroad Supply Co., 235 Ill. App. 228.

what amount or that it is to be made at all by the security holder.'' That case merely holds that, according to the evidence which was introduced, the one who made the payment was not the agent of the debtor. That does not mean, however, that the plaintiff and defendant here could not, as a matter of law, make a contract whereby the plaintiff would have the right to act for the defendant in making a payment for the defendant on its account.

No case cited or found seems to hold that where a debtor requests its creditor to manufacture and ship for it certain merchandise in order to fill a contract which the debtor has made with a third person, the debtor may not, by agreement with the creditor, empower the latter to reduce the debt of the debtor, *pro tanto* whenever in the future the creditor receives the proceeds of the transaction from the third person, and notifies the debtor to that effect; and as, in our opinion, the evidence shows that such were the contractual relations here between the plaintiff and the defendant on October 20, 1909, when the plaintiff sent the credit memorandum to the defendant, it follows that there was such an acknowledgment by the defendant of its debt on October 20, 1909, that a new promise to pay the residue was implied and the statute at that time was tolled. *Park Bank v. Schneidermeyer,* 62 Mo. App. 179; *Stark v. Somerville,* 40 Ontario L. R. 374; *McKeon v. Byington,* 70 Conn. 429, 39 Atl. 853; *Buffinton v. Chase,* 152 Mass. 534, 25 N. E. 977; *Nunn v. McKnight,* 79 Ark. 393, 96 S. W. 193.

Further, even excluding consideration of the credit as having been specially authorized, we are of the opinion that the evidence shows (1) that there was a payment; (2) an application of it by the plaintiff on October 20, 1909; (3) notice thereof to the defendant, and (4) the equivalent of an affirmative ratification by the defendant. *Clarkin v. Brown,* 80 Minn. 361, 83 N. W. 351; *First Nat. Bank of Utica v. Ballou,* 49 N. Y.

155; *Gorman v. Pettus,* 72 Ark. 76, 77 S. W. 907. Whether, therefore, the defendant specially authorized the payment, or approved it after it was made, or both, it follows that there was such an acknowledgment of the indebtedness within the statutory period that the plaintiff is entitled to recover.

It may be that a strong argument can be made to the effect that the request, or order, of July 3, 1909, constituted, by innuendo at least, an acknowledgment of its debt to the plaintiff on that date, but, that would not arise from the fact that it had assigned or turned over any property, or bill, or note, or something in the nature of present collateral as a payment then or in the future; it would arise, if at all, from an inference from what it said as showing its intention or state of mind. In the note and kindred cases, where it has been held that the statute was tolled not at the time of payment but at the anterior time of delivery, the reason assigned is that at the time when the creditor got the property or its evidence there was then an acknowledgment, and whatever occurred thereafter, such as payment, related back to the time of delivery. As we have said, here, no property was delivered on July 3, and so the payment on October 20 was not for property or any obligation which was in existence and transferred to it on July 3, and as a consequence the payment, and credit, and approval by the defendant at the later date constituted, as a separate congeries of acts, a sufficient acknowledgment.

There is another significant circumstance which has not so far been seriously considered, that is, the effect of the belated entry on page 164 of the defendant's journal, of April, 1914, of certain items credited to profit and loss in the plaintiff's account. That entry recites that it is, "To take up sundry items of credit to us for profit from shipments of material made by the Am. Steel Fdries. on our orders, same

having been held in suspense." There are eleven items set forth and the last is as follows: "Oct. 20, 1909, Cr. Memo. 12.28." This is a written admission in the regular account books of the defendant that on October 20, 1909, the defendant, pursuant to a credit memorandum, was entitled to a credit in the sum of $12.28, and an admission, in consequence, that credit was given by the plaintiff on that date.

In *Coulson v. Hartz,* 47 Ill. App. 20, where a widow presented a claim against her deceased husband's estate, the court held that entries of the husband appearing in his widow's account in his ledger and showing the entry of a balance due her, and certain other items, within five years, took the case out of the statute. In that case the late Mr. Justice Cartwright said: "An admission, wherever found, is admissible in evidence against the person making it. * * * The balance in the ledger was an admission by which Samuel B. Hartz acknowledged without condition or qualification that the amount there entered was due to appellee and unpaid. From such admission it seems that a promise to pay may be fairly implied."

It may well be that the entry referred to in the instant case, by itself, is insufficient as an acknowledgment on April, 1914, to give rise to an implied promise to pay, but, as a written statement by the defendant, that is, as an admission, it is an evidentiary and corroborative circumstance, relating back as it does to the event of October 20, 1909, and tends, further, to show that the defendant received and recognized the credit memorandum and made its final entry from that source, and, so, thereby, to that extent, acknowledged the contention of the plaintiff that the transaction beginning with the defendant's request of July 3, 1909, was completed on and not completed until October 20, 1909.

The cause was tried in the trial court without a

jury, and in this court, only on the theory involving the application of the five-year-statute of limitations; and there being no dispute that the indebtedness which had not been paid was $20,184.65, the judgment will be reversed and judgment entered here in favor of the plaintiff and against the defendant for the amount of principal with interest from April 21, 1923, at the stated rate, making a total of $21,866.80.

*Judgment reversed and judgment here.*

O'CONNOR, P. J., concurs.

MR. JUSTICE THOMSON, specially concurring: I concur in the decision in this case, but I am not able to agree with all that is said in the foregoing opinion. The simple question in this case is whether there was an acknowledgment of the debt by the debtor at any time after August 21, 1909,—such an acknowledgment as amounted to "an unqualified admission that the debt is due and unpaid, nothing being said or done at the time rebutting the presumption of a promise to pay." *Carroll v. Forsyth,* 69 Ill. 127; *Coulson v. Hartz,* 47 Ill. App. 20. The defendant contends that nothing occurred in the way of an acknowledgment of this debt, by it, after it transmitted the order from the railway company to the plaintiff on July 3, 1909. This order did not constitute an existing account between the defendant and the railway company, but it was contemplated that under that order the plaintiff would manufacture the goods shipped to the railway company, bill the railway company direct and receive the purchase price agreed upon between the railway company and the defendant, in full, and thereupon credit the account of the defendant with the proportion of the purchase price, to which it was entitled. Of course, when the defendant transmitted the order from the railway company to the plaintiff on July 3, with the request that the latter fill the order, collect the amount due on it, and credit the account of the defendant with the part of the collection to which

254    APPELLATE COURTS OF ILLINOIS.

Amer. Steel Foundries v. The Railroad Supply Co., 235 Ill. App. 228.

it was entitled, it may be said to have made such an acknowledgment of its indebtedness as to toll the statute, but that does not mean that nothing further could thereafter have occurred which would have the same effect. Under the custom which prevailed with these parties in the handling of orders, credit was never given the defendant on the plaintiff's books as of the date the defendant transmitted the orders to the plaintiff, nor was it the habit of the defendant to show a credit on its books, as to these orders, as of that date. At the time this plan of handling orders was put into effect, or shortly thereafter, the defendant itself explained in a letter to one of its customers that the plan was for the purpose of saving double accounting, and the defendant advised its customer that under this arrangement the plaintiff would, thereafter, "invoice direct for all couplers manufactured by them for our account." It will thus be seen that there was no assignment of the order to the plaintiff. When the latter manufactured the goods under the order, they were still manufactured for the account of the defendant and the method of billing which was adopted was, as the defendant explained, to save double accounting. It was also, of course, due to the fact that the defendant's credit was impaired, at that time. Nothing whatever appears in the handling of these orders which would indicate that the account of the defendant with the plaintiff was to be entitled to a credit prior to the time when the plaintiff collected the accounts. The defendant itself states in another letter that under this plan which was adopted, the plaintiff was to manufacture the goods ordered, and to bill the defendant's customers, which bills were to be "collected by these companies *for our account,* crediting to our account the difference between the purchase price and the amount for which the goods were sold." This indicates as clearly as anything could, that when the plaintiff collected the money

from the defendant's customers, they were collecting it for the account of the defendant, and, under the custom adopted, when the collections were thus made, the plaintiff was both authorized and directed to credit the defendant's account with the proper amount. Admittedly, the statute would be tolled if the defendant made a payment on its indebtedness. The defendant, being a corporation, would necessarily make a payment through a duly authorized agent. There is no reason why the debtor may not constitute the creditor an agent for that purpose. In this connection, defendant cites the case of *P. Ballantine & Sons v. Macken*, 94 N. J. L. 502, 110 Atl. 910, where the court pointed out that it had been held that a creditor cannot be made the debtor *in invitum* so as to make an act done by him in the name of the debtor operate as a new promise to himself. Citing *Wolford v. Cook*, 71 Minn. 77. As the court points out in the *Ballantine* case, that holding is in furtherance of the doctrine that a creditor cannot impart legal vitality to the debtor's obligation, so as to revive it, "by his independent act." But that is not saying that the debtor may not enter into an agreement with his creditor which will constitute the act of the creditor, in crediting the debtor's account with a payment, not the independent act of the creditor, but the debtor's act, by its duly authorized agent.

The method of handling these orders, including the act of the plaintiff in crediting the defendant's account with its proportionate share of receipts from the orders, at the time the goods were paid for, was repeatedly assented to by the defendant, as the evidence shows. This method of handling these items differentiates this case from practically all those on which the defendant relies.

But, entirely aside from the action of the defendant in constituting the plaintiff its agent, to give its account proper credits from time to time, as these or-

ders were paid for, the evidence shows the express approval and ratification, by the defendant, of the credit given its account by the plaintiff, in connection with the order in question, even after the plaintiff received payment for the goods involved and as late as October 20, 1909. Under that date the plaintiff wrote the defendant saying: "We have *this day* credited your account as follows," then giving the proper amount of credit under this order. The defendant not only acquiesced in that act of the plaintiff, in crediting its account with that item on "this day," namely, October 20, 1909, by its silence and receipt of that information without comment, but later on adopted the credit, as of that date, by so entering it on its books. The defendant argues that if that transaction of October 20 could have the effect contended for by the plaintiff, it was within the power of the plaintiff to defer sending its credit memorandum for months or years, and thus postpone the tolling of the statute as long as it desired. That, of course, is not the case. It is not merely the sending of the credit memorandum on October 20 that had the effect of tolling the statute on that day, but it is the fact that, having received that credit memorandum, advising it that the plaintiff had credited its account with the item in question, on that day, the defendant then assented thereto. The defendant may not accept the specific advice from its creditor, that the latter has credited its account with a given item on a stated date and assent to that act of the creditor, and adopt that credit as of that date, and thereafter successfully contend that it did not then make such an acknowledgment of its indebtedness as would toll the statute of limitations. The case at bar is quite different from that of *Wanamaker & Brown v. Plank,* 117 Ill. App. 327, where this court held that there was no principle of law which made the holder of collateral security, placed in his hands coincident with the

making of a note thereby secured, an agent of the debtor with authority to bind him by a new promise to be implied by a payment of which the debtor is ignorant, having no knowledge as to when it was made or in what amount or that it had been made at all by the security holder. Here, the debtor was advised by the creditor that a given amount had been credited to the debtor's account, stating the amount of the credit and the date when it had been made, and this act of the creditor was acquiesced in by the debtor, and subsequently the debtor entered that item in its own books as of the date contained in the creditor's advice.